IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL HALL,

*Plaintiff,*

v.

QUEST MANAGEMENT GROUP, LLC,

*Defendant.*

Civil Action No.: ELH-11-2190

## MEMORANDUM OPINION

Plaintiff Michael Hall, who is self represented, has sued his former employer, Quest Management Group, LLC ("Quest"), defendant, alleging retaliation and discrimination on the basis of race in connection with his discharge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"). *See* Complaint (ECF 1). At the conclusion of discovery, Quest moved for summary judgment ("Motion," ECF 23). The matter has been fully briefed, and no hearing is necessary to resolve the Motion.[1] *See* Local Rule 105.6.

### Factual Background[2]

Quest is a property management company that manages apartment complexes, primarily in the State of Maryland. *See* Affidavit of Diana Pollard, defendant's Exh. 2, ¶ 2. In August 2008, Hall, who is African American, was hired by Quest Property Manager Diana Pollard, who is Caucasian, to serve as a "Maintenance Technician" at Quest's Brenbrook Apartments facility

---

[1] The Court has considered defendant's supporting memorandum ("Memo," ECF 23-1), plaintiff's opposition to the Motion ("Opposition," ECF 24), and defendant's reply ("Reply," ECF 26), as well as the numerous exhibits submitted by the parties.

[2] The Court must construe the facts in the light most favorable to plaintiff as the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Because plaintiff is proceeding *pro se*, his filings have been "'liberally construed'" and "'held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citation omitted).

("Brenbrook") in Randallstown, Maryland. *Id.* ¶ 3-4. Hall began working at Brenbrook on or about August 12, 2008. *Id.* ¶ 4.

At Brenbrook, Hall worked with one other Maintenance Technician, Dontrelle Hart, who is also African American. *Id.* ¶ 6. Hart began working at Brenbrook on or about August 11, 2008. *Id.* ¶ 9. Hall testified that he (Hall) worked at Brenbrook for approximately three days before Hart began working there, *see* Defendant's Exh. 3, Deposition of Michael N. Hall, 36:17-25, while Pollard avers that Hart was hired one day earlier. Pollard Aff. ¶ 10. However, Pollard "did not consider either Mr. Hall or Mr. Hart senior." *Id.* ¶ 11.

In her Affidavit, Pollard asserts that it "quickly became apparent to [her] that Mr. Hall had below-average maintenance skills and lacked initiative. In particular, Mr. Hall lacked critical skills in wiring, air conditioning installation, HVAC systems, appliances and tile work." *Id.* ¶ 7. In Pollard's view, Hall was "very slow, and would take hours performing tasks which took others little time." *Id.* ¶ 8.[3] In contrast, Hall insists that he was "a perfect employee." Hall Dep., 50:19-25. At his deposition, Hall testified that any negative assessment of his performance was the result of "lying." *Id.* at 43:4-5.

Pollard also avers in her Affidavit that it "became evident to [her], within Mr. Hall's first few months at Brenbrook, that Mr. Hall could not get along with" Hart. Pollard Aff. ¶ 9. The two men were highly competitive, with plaintiff complaining that he and Hart received the same pay, although plaintiff believed he was a superior worker. *Id.* In Pollard's view, Hart was the superior worker. *Id.* The tension between Hall and Hart escalated until Pollard "feared [they]

---

[3] In the Memo, at 9 n.3, defendant submits that plaintiff conceded at his deposition, at 79 and 82, that the resume he submitted to Quest upon his application represented that he had earned a certificate that he did not actually possess. However, the pages of deposition testimony to which defendant points have not been made part of the record. Hall's resume, defendant's Exhibit 5, shows that, prior to his employment with Quest, he held five positions as "Maintenance Technician," but none for more than one to two years.

might have a physical altercation." *Id*. ¶ 10.   At that point, in November 2008, Hall was transferred to another Quest facility, Crescent Pointe Apartments ("Crescent Pointe") in Lochearn, Maryland, approximately three miles from Brenbrook.   *Id*.   Pollard transferred Hall rather than Hart because she believed the interpersonal conflict was "mostly due to Mr. Hall," and because she felt Hart had "better maintenance skills…." *Id*.

At his deposition, Hall testified that he was "furious" about the transfer.   Hall Dep., 119:4-5.   As Maintenance Technician, Hall lived at Brenbrook at reduced rent.   Pollard Aff. ¶ 13. He testified that he wanted to live at the same complex where he worked.   Hall Dep., 119:6-8.   In light of Hall's insistence that he wanted to live where he worked, Pollard offered Hall the opportunity to move to Crescent Pointe.   Pollard Aff. ¶ 13.   But, Hall refused, because he regarded Crescent Point as a "dump."   Hall Dep., 119:8-9.   Hall also complained, in a letter to Quest of March 5, 2009, that his "seniority was taken away" when he was moved to Crescent Pointe.   Defendant's Exh. 6.[4]

Pollard acknowledges in her Affidavit that Hall was "unhappy with the transfer," but insists that he did not suffer any loss of pay after he was transferred to Crescent Pointe, and remained in the position of Maintenance Technician.   Pollard Aff. ¶ 10.   She asserts that "Mr. Hall did not suffer any loss of seniority on account of his transfer, since he was never considered senior to Mr. Hart." *Id*. ¶ 11.   Hall did not argue in his Opposition that he lost seniority.[5]   In any event, it appears undisputed that Hall's pay and job duties were unaffected by the transfer.

James Humphreys was Hall's direct supervisor at Crescent Pointe. *Id.* ¶ 15.   Humphreys, who is Caucasian, was present at Hall's initial job interview and "agreed with [Pollard's]

---

[4] This letter is discussed in further detail, *infra*.

[5] *But see* defendant's Exhibit 6, plaintiff's letter of March 5, 2009, discussed *infra*, complaining about his loss of seniority.

decision to hire Mr. Hall." *Id.* ¶ 4. Pollard avers that, after Hall was transferred to Crescent Pointe, Humphreys "soon reported to Pollard that he could not assign Mr. Hall anything but the most basic maintenance jobs, since Mr. Hall lacked the necessary skills for heat pump or HVAC service or installation, plumbing or wiring." *Id.* ¶ 16. According to Pollard, Humphreys complained that Hall was "slow" and "often did not complete jobs properly the first time around, requiring another Maintenance Technician to complete or correct [his] work." *Id.* ¶ 17.

Hall was, in turn, quite critical of Humphreys. On March 5, 2009, plaintiff submitted a handwritten letter to Quest,[6] complaining that his "seniority was taken away" when he was moved to Crescent Pointe. *See* Letter of March 5, 2009, defendant's Exh. 6; Pollard Aff. ¶ 19. He also complained that Humphreys "constantly use[d] bad language that is very offensive" and "ignore[d] dangerous safety Violations and Equal Rights Violations." Defendant's Exh. 6. Further, Hall wrote that, when he complained to Humphreys about Humphreys' conduct, Humphreys told him to stop "bitching" and join "the unemployment line." *Id.* Hall also alleged that he was "being treated un-equally and paid un-equal because of [his] skin color." *Id.* However, Hall did not specify how he was being treated or paid "un-equally."

Pollard met with Hall the day he submitted the letter. Pollard Aff. ¶ 19. During the meeting, Hall complained that Humphreys was aware of "many safety violations," but did not rectify them;[7] cursed frequently; took two to three hour lunch breaks; watched television in his

---

[6] The letter is addressed "To whom it may concern." It is not clear from the record to whom Hall submitted the letter, but it is undisputed that Pollard reviewed it on behalf of Quest. Hall appears to argue that the letter was directed at an unidentified superior of Pollard's, but it is unclear what steps plaintiff took, if any, to have the letter reviewed by anyone other than Pollard. *See* Hall Dep., 43:12-16.

[7] It is unclear how plaintiff's allegations that Humphreys ignored safety violations implicate racial discrimination. To the extent that Hall asserts his termination was based on the fact that he complained about the safety violations, Title VII is not implicated. In any event, in light of Hall's allegations, Quest brought in a Regional Maintenance Supervisor to investigate

office; and left work early. *Id*. When Pollard asked Hall "about his allegation of equal rights violations or unequal treatment," Hall complained that, unlike the African American employees, Humphreys enjoyed the ability to "break company rules, watch television, take long lunch breaks, and leave early." *Id.* ¶ 20. At his deposition, Hall confirmed that the basis of his claim of unequal treatment was that Humphreys was "allowed to break company rules and regulations" by "watch[ing] TV during working hours" and "work[ing] side jobs during company time,"[8] while "the blacks cannot." Hall Dep., 185:12-19.

Immediately after Pollard met with Hall, she demoted Humphreys for misuse of company time. Pollard Aff. ¶ 28. In particular, Humphreys was demoted from the position of Maintenance Supervisor to the position of Maintenance Technician, the same position held by plaintiff, and took a significant cut in pay. *Id.* Humphreys was also transferred to another Quest facility "so that Mr. Hall would not have to work around him," and has not been restored to the

---

safety violations at Crescent Pointe; none were found. Pollard Aff. ¶ 29. Thus, Pollard found "no evidence to substantiate Mr. Hall's allegation that Mr. Humphreys 'also ignores safety violations.'" *Id*. In his Opposition, at 2, plaintiff steadfastly asserts that Humphreys "was using the wrong wiring for high voltages and he didn't know what he was doing."

[8] With respect to Hall's allegations regarding "side jobs," Pollard noted that Humphreys "had a contractor's license and was frequently hired by Quest to perform painting jobs on weekends and holidays." *Id.* ¶ 27. At his deposition, Hall confirmed that the "side jobs" to which he referred were jobs "[p]ainting the company apartments for the company." Hall Dep., 185:20-23. To the extent that these opportunities were open to Humphreys and not to Hall, Pollard asserts that Hall lacked the necessary licensure. Pollard Aff. ¶ 27. Hall does not dispute this assertion in his Opposition.

At his deposition, plaintiff also complained that Humphreys enjoyed an upgraded apartment, while Hall did not, and that Humphreys was privileged to "tell lies." Pollard asserts, and Hall does not dispute, that Humphreys paid for the upgrades himself, and that Hall could have had similar upgrades had he been willing to pay for them. *Id.* ¶ 25. At his deposition, with respect to the allegations of lying, Hall pointed only to an incident in which Humphreys misinformed him about the carryover of vacation time, a matter that was later solved administratively. *See* Hall Dep., 188:19-23.

position of Maintenance Supervisor.  *Id.*[9]

Hall was personally informed of Humphreys' demotion.  *Id.* ¶ 30.  He also received a letter from Cheryl Neff, Quest's Office Manager, dated March 20, 2009, explaining that Humphreys had been demoted for misuse of company time.  *See* defendant's Exh. 7.  At his deposition, Hall expressed frustration with the letter because it did not refer to Hall's concerns about unequal treatment as the cause of Humphreys' demotion.  Hall Dep., 45:23-25.  In his Opposition, plaintiff has explained that the letter of March 20, 2009, was provided in response to his request for "a written response from the company," as well as "a written apologie [sic] from Mr. Humphrey[s]."  *Id.* at 3.  He also asserted that Pollard orally informed him that an apology from Humphreys would not be forthcoming because Humphreys "was mad and wouldn't apologize," but that Hall "didn't need a response from the co[mpany] because everything in the letter was true."  *Id.*  But, Hall "told her [he] wanted one anyway."  *Id.*

With respect to Humphreys, plaintiff testified: "I know he was a racist."  Hall Dep., 146:24.  However, plaintiff does not point to any racially motivated language or conduct on the part of Humphreys.  For example, in his Opposition, at 8, plaintiff insisted that Quest "is covering up and hid[ing] what Mr. Humphreys did…."  But, Hall did not specify what it is he believes Humphreys "did."

As noted, in Hall's letter to Quest of March 5, 2009, he asserted that he was "paid un-equal because of [his] skin color."  Defendant's Exh. 6.  But, it is undisputed that Hall was paid the same as Hart, his African-American co-worker at Brenbrook, and was paid more than Ernest McClain, his African-American co-worker at Crescent Pointe.  *See* Pollard Aff. ¶ 22; Hall Dep., 101:15-22.  To the extent that Humphreys was paid more than Hall at the time Hall wrote the

---

[9] Hall appears to assert that Humphreys was not transferred immediately, but rather upon Hall's request, approximately two weeks later.  *See* Opposition at 4, 8.

complaint letter, Humphreys held a different position than Hall.  At that time, Humphreys was a Maintenance Supervisor, while Hall was a Maintenance Technician.  Pollard Aff. ¶ 22.  Plaintiff has not pointed to any other Caucasian comparators, as all of the Maintenance Technicians employed at the relevant time were African American.

Contrary to plaintiff's contention, Pollard asserts that she found "no evidence that Mr. Hall was treated or paid differently, or subjected to any form of discrimination."  Pollard Aff. ¶ 22.  She was unable to "identify any way in which Mr. Humphreys had mistreated Mr. Hall or any of the other Maintenance Technicians on the basis of race."  *Id.* ¶ 23.  Nor did she uncover any "evidence that Mr. Humphreys made racially derogatory comments or discriminated against individuals on the basis of their race."  *Id.*  Although she found that Humphreys was "loud and gruff, and sometimes unprofessional," she concluded that there was "no evidence that his conduct or language had any racial or discriminatory purpose or impact."  *Id.* ¶ 24.

After Humphreys' demotion in March 2009, Humphreys was replaced as Maintenance Supervisor by Junior Richards, who is African American.  *Id.* ¶ 32.  Pollard avers that she "did not tell Mr. Richards that Mr. Hall had any performance issues," but, nonetheless, "[w]ithin the first few days of beginning work for Quest," Richards identified Hall to Pollard as an unsatisfactory employee, asserting that he "did not think that Mr. Hall was going to work out."  *Id.* ¶¶ 34, 35.  Immediately upon Richards' arrival, Hall began to insist that Richards "had been brought in to get rid of him."  *Id.* ¶ 35.  At his deposition, Hall testified: "I believe they got that black guy in there [*i.e.* Richards] to get rid of me."  Hall Dep., 17:24-25.  Hall repeatedly referred to Richards as an "Uncle Tom," and conceded that he had used the term to Richards' face during the time of his employment.  *Id.* at 20:7; 144:20-22; 223:16-19.  In his view,

Richards "kisse[d] up to the white plant manager,[10] he was being subservient, he was getting rid of black employees for her…." *Id.* at 145:20-22.[11]

On May 12, 2009, approximately two months after Hall submitted the complaint letter that led to Humphreys' termination, Hall was issued a performance evaluation that Pollard had completed. *See* Performance Evaluation, defendant's Exh. 1. It rated plaintiff's "Overall Performance" as "Below expectations," a rating of "2" on a scale of "1" to "5," with "5" representing the highest possible mark, "Outstanding." *Id.* at 8. Hall received one rating of "4," for the category "Conforms to uniform policy daily." *Id*. at 4. The evaluation was signed by both Pollard and Hall. *Id.* at 9.

The performance evaluation was highly critical of plaintiff's performance. For example, it stated, *id.* at 3:

> Michael has very basic maintenance skills such as punch outs, mailbox locks, light bulbs, etc.; however he is lacking many essential skills needed to complete more difficult tasks such as wiring, heat pump installation, troubleshooting and repairs, plumbing repairs. These areas are a large part of our daily work load and his lack of skills is making it very difficult for him to meet the requirements of the position.

Pollard also wrote: "On the more difficult calls such as plumbing, heat, A/C, Michael can usually not resolve these issues without guidance and assistance." *Id.* at 6. However, the evaluation spoke approvingly of Hall's "friendly and courteous" manner with supervisors, residents, customers, and vendors, *id.* at 4,5, although it noted that Hall would "occasionally sound very demeaning when speaking to other associates." *Id.* at 4.

Approximately two weeks after Hall's performance evaluation, plaintiff received a

---

[10] Although Pollard is never identified as a "plant manager" in any of the parties' submissions, context suggests that she is the subject of this sentence.

[11] In this statement, Hall refers to "employees" in the plural. But, he concedes that he was the only employee who was "gotten rid of." *Id.* at 145:23-146:5.

disciplinary suspension, spawned by events that began on May 25, 2009.  On that date, Richards gave Hall a list of tasks to complete by the next day, in order to prepare an apartment to be leased.  Pollard Aff. ¶ 41.  But, on May 26, 2009, Hall called in sick, and another Maintenance Technician had to be brought in to complete the tasks.  *Id*.[12]  Yet, on the day Hall was supposedly sick, he was twice seen inside a vacant apartment at Brenbrook, playing with his dog. *Id*. ¶ 42.  As a result, plaintiff was issued an immediate three-day suspension.  *Id*. ¶ 43.  Pollard asserts: "I knew of no reason for Mr. Hall to be inside a vacant apartment (not once but twice) at a property where he did not even regularly work, on a day when he was allegedly sick."  *Id*.[13]  In his Opposition, Hall protested that he was in the apartment for "a good reason"--to "remove all [his] tools from the day before."  Opposition at 6.

Plaintiff returned to work on May 29, 2009.  *Id*.  At his deposition, plaintiff testified that, during his three-day suspension, he filed a complaint with the Equal Employment Opportunity Commission ("EEOC"),[14] and "[c]ame back…after three days with [his] EEOC complaint, [and] showed everybody."  Hall Dep., 20:8-12.  Hall clarified that he showed the complaint to the Richards and other, unnamed employees who were present, but he did not allege that he showed it to Pollard.  *Id*. at 20:13-25.  In her Affidavit, Pollard asserts that at that time she "had no knowledge that Mr. Hall had visited or filed a complaint with the EEOC about his employment at Quest."  Pollard Aff. ¶ 47.[15]

---

[12] Apparently, Humphreys was assigned Hall's work, which Hall "laughed about…." Hall Dep., 221:3-13.

[13] Pollard asserts that she and Richards agreed that Hall had called in sick because he did not want to complete the list of tasks he had been assigned.  *Id*.

[14] In the Complaint, plaintiff stated that he went to the EEOC *after* he returned from the suspension.  *See id*. at 3 (stating that he "went to EECO [sic] on 06-01-09…").

[15] In its Memo, at 34 n.7, defendant cites Hall's deposition at 240 and asserts: "Plaintiff admits that he did not tell Ms. Pollard of his visit to the EEOC until after she had presented him

Pollard maintains that, after Hall returned to work following his suspension, Richards continued to complain about Hall's performance, which led to her decision to terminate plaintiff. *Id.* ¶ 44.  In her affidavit, Pollard asserts, *id.*:

> After Mr. Hall's return to work on May 29, 2009, Mr. Richards complained to me that Mr. Hall still showed no sign of improvement, or any willingness to improve.  Mr. Richards told me that Mr. Hall provided very little maintenance support and was of little value to him when he was deciding what work to assign and who to assign it to.  Therefore, I decided to terminate Mr. Hall's employment and Mr. Richards told me he agreed with this decision.

Pollard claims that, at the time of plaintiff's termination, she was unaware that plaintiff had filed a complaint with the EEOC.  *Id.* ¶ 47.  Hall was informed of his termination by Pollard and Richards on June 4, 2009.  *Id.* ¶ 46.  He was also given a letter signed by Pollard, dated June 4, 2009, notifying him of his discharge.  The letter, a copy of which was appended to the Complaint, did not provide a reason for the termination.  Plaintiff was replaced by an African American employee, Maurice Walker, who is still employed by Quest as a Maintenance Technician.  *Id.* ¶ 48.

The EEOC issued plaintiff a right to sue letter on May 11, 2011.[16]  Plaintiff filed suit on August 8, 2011, *see* ECF 1, using a form complaint.  In the section stating, "The facts of my claim are," plaintiff wrote the following, *id.* at 2-3:

> When I constantly complain about un-safe and un-equal treatment to black employees by white supervisor, I was fired.  I was very disappointed [sic] with the company answer [sic] to the letter I wrote on 03-05-09.  They cover it up and changed my complaint around to save the long-time supervisor his job.  Making him look-like the victim and I was the criminal.  I went to EECO [sic] on 06-01-09 and (3) days [later] I was fired.
>
> Additional facts will be included in the Discussion.

with his notice of termination."  However, the page of deposition testimony on which defendant relies has not been made part of the record.

[16] A copy of the right to sue letter was appended to Complaint.

## Standard of Review

Defendant has moved for summary judgment under Fed. R. Civ. P. 56. Summary judgment is properly granted only if the movant shows that "'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting former Fed. R. Civ. P. 56(c)). To avoid summary judgment, the nonmoving party must demonstrate that there are disputes of material fact that preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving the motion, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott*, *supra*, 550 U.S. at 378. A "party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a dispute of material facts. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson, supra*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict" for the nonmoving party, there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

## Discussion

As noted, plaintiff asserts that he was subjected to unlawful retaliation and discrimination

on the basis of race, in violation of Title VII.

A plaintiff who, like Hall, lacks direct evidence of discrimination may proceed under the burden shifting approach popularly known as the *McDonnell Douglas* proof scheme.   *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   An employee who proceeds under the *McDonnell Douglas* approach must first establish a "prima facie case" of discrimination or retaliation.  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).   If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for the conduct complained of.   *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).   When the defendant meets his burden, the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason," and that the plaintiff "has been the victim of intentional discrimination."  *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981).

*Discriminatory Discharge*

In order to establish a prima facie case of discriminatory discharge, a plaintiff must show that

> (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).

It is undisputed that, as an African American, Hall is a member of a protected class.  It is also undisputed that termination constitutes an adverse employment action.   However, Quest insists that Hall cannot establish a prima facie case of race discrimination because he "cannot

demonstrate that he was performing at a level and in a manner that met Quest's legitimate expectations for his performance at the time of his discharge."  Memo at 26.  Quest also insists that Hall cannot establish a prima facie case because, "following his termination, his Maintenance Technician position was not filled by someone 'outside the protected class.'"  *Id.* at 27-28.

Moreover, Quest argues that even if plaintiff could, *arguendo*, establish a prima facie case, Quest would still be entitled to summary judgment because Hall cannot produce evidence of pretext.  *Id.*  In Quest's view, Hall's claims are further undercut by "the fact that the same individual that hired Plaintiff, Ms. Pollard, is also the individual who made the decision to terminate his employment," *id.* at 30, and by the fact that Richards, "who recommended and participated in the decision to terminate Plaintiff's employment," is, like Hall, African American. *Id.* at 31.

In his Opposition, plaintiff did not respond to any of these legal arguments.  Rather, he explains why he chose the job at Brenbrook over other offers he had received, *id.* at 1; reiterates his complaints about Humphreys' performance issues, *id.* at 2; notes that he told his co-workers at the time he handed in the complaint letter that "if [Pollard] fired [him] that is the real reason why," *id.* at 3; complains that he did not receive overtime pay to which he was entitled or a full hour for lunch, *id.* at 4; insists that his termination was a "set up," *id.*; suggests that Quest permitted "fire hazards" in order to "burn down a building to collect the high insurance money," *id.* at 5; and restates his belief that Pollard purposely "found" Richards, "a black supervisor that was willing to string [him] up," because Richards was an "Uncle Tom."  *Id.* at 6.  At his deposition, plaintiff stated that he has sued "[a]round two or three" former employers for race discrimination, *see* Hall Dep. at 77:15-25, and in the Opposition, Hall states that at least one of

the previous lawsuits was meritorious, but he "let [it] go" because he preferred to "find a better job at a different property…." *Id.* at 7.[17]  Plaintiff rounds off the Opposition with a screed about how he has "been dealing with 'Racism' and cover-up for a long time…", *id.* at 8, and notes that he supports the family of Trayvon Martin, an African American teenager who was shot by a neighborhood watch volunteer in Florida, allegedly due to racial bias.  *Id.*  Plaintiff also compared himself to Martin at his deposition.  *See* Hall Dep., 245:18-246:19 ("So you think your situation is similar to Trayvon Martin?"  "Correct.  Correct.").[18]

For several reasons, plaintiff cannot establish a prima facie case of discriminatory discharge.

It is undisputed that, after his termination, plaintiff's position was not filled by an applicant who is outside of his protected class.  Rather, plaintiff was replaced by Maurice Walker, an African American, who is still employed by Quest as a Maintenance Technician.

---

[17] Defendants have submitted a complaint that Hall filed in the United States District Court for the Northern District of Georgia on March 20, 2007, against "The Crestmark Club." *See* Defendant's Exh. 4.  The basis of the complaint is substantially similar to that of the case at bar, with plaintiff complaining that he was discriminated against on the basis of race and terminated in retaliation "for complaining about unfair and unequal treatment to (blacks)." *Id.* at 2.

[18] Although plaintiff has submitted several exhibits, he did not discuss them in his Opposition, and it is unclear for what purpose he submitted them.  For example, plaintiff appended two pages that appear to be from an employee manual.  Four passages are "starred": one about job responsibilities; two about a 90 day "orientation period" for new associates, at the end of which a performance evaluation is to be conducted; and one noting the time allotted to employees for lunch.  It is not clear how these passages are pertinent to a determination of whether Hall was subjected to racial discrimination.  Plaintiff also appended a "Service Order" for apartment repairs at Brenbrook, and some sort of payroll documentation with a handwritten annotation, presumably by plaintiff, complaining about "having [his] rent taken out of [his] pay check" and alleging that Quest "cheated [him] on [his] overtime pay…."  But, plaintiff has not brought any wage claims, nor does he allege that only African American employees were so "cheated."  And, plaintiff has appended a document dated June 5, 2009, directed to "All Crescent Pointe Residents."  In the document, apparently drafted by Hall, he alerts the residents to alleged safety hazards and advises that he was fired for complaining about them.  He also asks residents to sign a petition requesting his reinstatement.

Pollard Aff. ¶ 48.  *See Hill, supra*, 354 F.3d at 285.

In addition, Hall has not shown that he was performing "at a level that met [his] employer's legitimate expectations" at the time he was terminated.  *Hill,* 354 F.3d at 285.  The Fourth Circuit has said that "considering an employer's legitimate expectations comports with the purpose of requiring the establishment of a prima facie case—to screen out those cases whose facts give rise to an inference of nondiscrimination, in other words, to eliminate the most common, nondiscriminatory reasons for the employer's conduct."  *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514 (4th Cir. 2006).  Occasionally, "consideration of the employer's legitimate job expectations at the prima facie stage" requires the court to consider "evidence the employer would typically present in the second stage of the *McDonnell Douglas* framework, that is, where the employer offers the legitimate, non-discriminatory reason for the termination."  *Id.* at 515.

It is true that, "where application of the qualification or expectation element of the prima facie case seems to preclude an otherwise meritorious claim, the plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, 'legitimate.'"  *Id.* at 517.  But, Hall's bald assertions that Pollard is "lying" about his performance cannot establish, by a preponderance of the evidence, that he complied with Quest's expectations for his performance at the time of his termination.  Hall Dep., 43:4-5.  Notably, Hall has not alleged that his supervisors' expectations were bogus or unreasonable, or that he had "critical skills in wiring, air conditioning installation, HVAC systems, appliances and tile work," as desired by Quest.  *See* Pollard Aff. ¶¶ 7-8.  Indeed, he has not produced any evidence as to his skills or qualifications.  Nor has Hall disputed the particularized criticisms found in his performance evaluation, or the claim that he was transferred because he could not get along with his co-worker, Hart.  Although plaintiff challenges his disciplinary suspension, arguing that he had a good reason to be in the

vacant apartment, he has not explained why he was twice in the apartment, when he was supposedly sick, or why he stayed in the vacant apartment to play with his dog.

Moreover, despite Hall's belief that he was "a perfect employee," Hall Dep., 50:19-25, it is Quest's perception as to Hall's abilities and attitude that is pertinent. As the Fourth Circuit has said, "'[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (citation omitted). Hall conceded at his deposition that Pollard did not regard his performance as satisfactory. The following deposition testimony of Hall is relevant, *id.* at 41:21-42:2:

> Q: And your opinion of your performance is that you were a good performer, correct?
>
> A: Yes.
>
> Q: And Diana's [*i.e.*, Pollard's] opinion was that you were not a good performer, correct?
>
> A: Correct.

Even if Hall could establish a prima facie case, he has presented no evidence that the complaints about his performance were mere pretext, or that he was terminated because he is African American. Indeed, Hall has not presented a scintilla of evidence that he was subjected to *any* discrimination on the basis of race during the course of his employment with Quest. For example, Hall alleges that Humphreys, a Caucasian, subjected him to "un-equal treatment," but he has not identified any discriminatory conduct on the part of Humphreys. Although Hall alleges that Humphreys was allowed special privileges, Hall overlooks that his complaints about Humphreys' improper use of company time led to Humphreys' demotion for such conduct.

At Hall's deposition, when he was asked to clarify the basis of his claim of racial discrimination, his response did not advance his claim:

> Q: Now, why do you believe anything that happened to you was because of your race?

A: Because Jim [Humphreys] was white, the manager was white and they cover
   up for each other.  And all the employees was black.

Hall Dep., 205:11-15.

It is also salient that the same actor, Pollard, made the decision both to hire and to fire plaintiff.  Hall was hired in August 2008 and terminated in June 2009.  Therefore, defendant is entitled to an inference that discrimination was not the motive for Hall's termination.  *See Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."); *See also Murray v. United Food & Commercial Workers Union*, 100 F. App'x 165, 174 (4th Cir. 2004) (finding a period as long as seventeen months to be a "relatively short time span" for the purposes of establishing this inference).

Plaintiff concedes that his termination was prompted both by Richards, who is African American, and Pollard, who is Caucasian.  *See* Hall Dep., 42:11-14 ("Q: Both Ms. Pollard and Mr. Richards jointly made the decision to terminate your employment, correct?"  "A: Yes.").  To the extent that Hall's termination was based on the assessment of Richards, defendant is entitled to yet another inference that discrimination was not the motive for Hall's termination.  As both Richards and Hall are African American, they are members of the same protected class.  To be sure, the Supreme Court has cautioned: "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)).  Indeed, plaintiff has alleged that Richards was an "Uncle Tom," eager to please his Caucasian supervisor.  Nevertheless, the fact that plaintiff and Richards are members of the same protected class "'substantially weakens any inference of discrimination.'"

*Orgain v. City of Salisbury*, 305 F. App'x 90, 103 (4th Cir. 2008) (citation omitted).  *See also Bryan v. Lucent Techs., Inc*., 307 F. Supp. 2d 726, 739 (D. Md. 2004) (stating that the "'fact that the decision makers were of the same protected class suggests no discriminatory motivation'") (citation omitted).

In my view, no reasonable jury could find that plaintiff was subjected to discrimination on the basis of race.  As to any claim of race discrimination in violation of Title VII, defendant is entitled to summary judgment.

*Retaliation*

"Title VII prohibits an employer from retaliating against an employee who exercises his Title VII rights."  *Thorn v. Sebelius*, 766 F.Supp.2d 585, 600 (D. Md. 2011).  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter").  The purpose of Title VII's antiretaliation provision is to "[m]aintain[] unfettered access to statutory remedial mechanisms" for employees who fear reprisal.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

In order to establish a claim for retaliation, the plaintiff must show that: (1) he engaged in protected activity; (2) the defendant took a material adverse employment action against him; and (3) that a causal connection existed between the protected activity and the adverse action.  *See A Society Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011); *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003).

The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005), *cert. denied,* 547 U.S. 1041 (2006). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding…, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 259 (4th Cir. 1998). It is undisputed that plaintiff's complaints about "un-equal treatment" and his filing of a complaint with the EEOC constitute protected activity.

With respect to the second element of a retaliation claim, an adverse employment action is one that "'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 219 (4th Cir.2007) (alteration in original) (citation omitted). A plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). Again, it is undisputed that termination constitutes an adverse employment action.

In defendant's view, however, plaintiff cannot establish a prima facie case of retaliation because he cannot establish the third element, as there is "no evidence of any causal connection between [plaintiff's] complaint and his subsequent termination." Memo at 33. Defendant argues that concerns about plaintiff's performance were raised well before plaintiff's complaint letter of March 5, 2009, and the filing of the complaint with the EEOC in late May or early June 2009, *id.* at 35, and concludes, Reply at 6:

Since Quest had already transferred Plaintiff from Brenbrook because of his inability to work with another Maintenance Technician, and because Plaintiff's new supervisor complained of Plaintiff's poor work performance *prior to* any protected activity, the Court should find no inference of any causal connection.

Further, defendant argues that, even if plaintiff could, *arguendo*, establish a prima facie case, Memo at 36, he "has no facts showing that the stated reason for his discharge was pretext and that the real reason he was discharged was because he complained about discrimination." *Id.* at 38.

As noted, defendant does not directly respond to plaintiff's legal arguments in the Opposition. Rather, he notes that he told his co-workers at the time he handed in the complaint letter that "if [Pollard] fired [him] that is the real reason why," *id.* at 3, and insists that his termination was a "set up." *Id.* at 4.

The Fourth Circuit "has held that evidence that the alleged adverse action occurred *shortly* after the employer became aware of the protected activity is sufficient to 'satisf[y] the less onerous burden of making a prima facie case of causa[tion].'" *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)) (emphasis and alterations in *Dowe*). Here, plaintiff was terminated approximately three months after complaining in writing to his employer about "unequal treatment," and less than a week after filing a complaint with the EEOC. And, at the stage of the prima facie case, a "plaintiff's burden is 'not onerous.'" *Warch*, *supra*, 435 F.3d at 515 (quoting *Burdine, supra,* 450 U.S. at 252). In my view, plaintiff has established a prima facie case of retaliation.

Nevertheless, the Fourth Circuit has explicitly stated that although a temporal connection "satisfies the less onerous burden of making a prima facie case of causality," it "far from conclusively establishes the requisite causal connection" that a plaintiff must demonstrate in

order to prevail.  *Williams, supra,* 871 F.2d at 457.   Quest has "articulated a legitimate, non-retaliatory reason for terminating [Hall's] employment….[Therefore, Hall] must demonstrate that [Quest's] explanation was merely a 'pretext' for a retaliatory action."  *Lauer v. Schewel Furniture Co., Inc.*, 84 F. App'x 323, 329 (4th Cir. 2004).

In order to establish pretext, Hall must show that Quest's explanation for his termination "was 'unworthy of credence,' and therefore a 'coverup' for unlawful discrimination."  *Id.* at 329-330 (quoting *Burdine, supra,* 450 U.S. at 256; *McDonnell Douglas, supra,* 411 U.S. at 805).  This plaintiff cannot do.  As discussed, plaintiff has not put forward any evidence that Quest's stated purpose for Hall's discharge—performance deficiencies—was pretextual.   Comparison with *Hughes v. Bedsole*, 48 F.3d 1376 (4th Cir. 1995), is instructive.

In *Hughes*, the plaintiff employee brought, *inter alia*, a retaliation claim[19] against her former employer because she was terminated, purportedly for causing two security violations, shortly after engaging in protected conduct, *i.e.* complaining about working conditions.  *Id.* at 1387.   In order to support her claim, Hughes relied on the temporal connection between her complaints and her termination, and on the fact that a co-worker who had also caused two security violations, but did not engage in protected conduct, was retained.  *Id.* at 1387-88.   The district court granted summary judgment in favor of the defendant employer because the plaintiff "failed to demonstrate a jury issue on the question of whether [the] decision to discharge [her] was motivated by an intent to retaliate for her free speech."  *Id.* at 1386.

The Fourth Circuit affirmed the grant of summary judgment, reasoning that there was no evidence that the decision-maker "harbored any resentment to [plaintiff] because she expressed her concerns about understaffing and improper training," and had in fact "agreed with [her]

---

[19] Hughes, a government employee, did not bring suit under Title VII, but rather under 42 U.S.C. § 1983, alleging retaliation for the exercise of her free speech rights.

concerns…." *Id.* at 1387-88.  In the Court's view, "[c]onsidering [the employer's] legitimate, nondiscriminatory reasons" for the termination, *i.e.* the security violations, "and the absence of any evidence of animus…on account of Hughes' free speech," the "temporal connection and the [co-worker's] receipt of no punishment after two similar security violations d[id] not create a jury issue." *Id.* at 1388.

In my view, the temporal connection between Hall's complaints and his termination is insufficient to "create a jury issue," in light of the unrefuted evidence of a non-discriminatory reason for Hall's discharge.  *Id.*  As in *Hughes*, there is an "absence of any evidence of animus" with respect to Hall's protected activity.  To the contrary, Quest took Hall's complaints about Humphreys seriously, and promptly took action to rectify the situation of which he complained. *Compare Rhoads v. F.D.I.C.*, 257 F.3d 373, 394 (2001) (reversing the district court's award of summary judgment to the defendant employer with respect to plaintiff's claim of retaliation under the Americans with Disabilities Act, and stating: "Viewed in the proper light, the record establishes that once [plaintiff] failed to heed [her employer's] warning not to consult an attorney, she was terminated, purportedly for excessive unexcused absenteeism, even though her fellow employees had not been discharged for the same conduct" and, at the time she was accused of absenteeism, plaintiff "had been working at home by mutual agreement with a…supervisor.").  *See also Pulley v. KPMG Consulting, Inc.*, 348 F. Supp. 2d 388, 397 (D. Md. 2004) (granting defendant employer's motion for summary judgment because defendant had "set forth legitimate non-discriminatory reasons for its termination of [plaintiff's] employment, including but not limited to that facts that [plaintiff] failed to complete his projects in a timely manner, was behaving insubordinately and was sending sarcastic e-mails to his supervisors"; by contrast, plaintiff did not "present any evidence that [defendant's] reasons for terminating his

- 22 -

employment were pretextual except for the temporal proximity of the termination to" plaintiff's engaging in protected activity).

"The sword of an EEOC complaint cannot be used as a shield to protect an employee from the consequences of inappropriate behavior that is incontrovertibly below the reasonable expectations of his employer." *Pulley, supra,* 348 F. Supp. 2d at 397.  In my view, the only argument Hall advances to show that his termination was in retaliation for his engaging in protected activity is "the timing of [the protected activity] and the timing of certain reprimands he received for poor performance of his duties.[]" *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993) (addressing retaliatory discharge in the context of 42 U.S.C. § 1983).  "This temporal proximity, however, is simply too slender a reed on which to rest a…retaliatory discharge claim." *Id.*

No reasonable jury could find that plaintiff was subjected to retaliation in violation of Title VII.  Accordingly, defendant is entitled to summary judgment.

### Conclusion

In his Opposition, plaintiff, referring to defendant, asserts: "They say I have no evidence, but I do." *Id.* at 8.  But, plaintiff has failed to present any evidence that he was subjected to racial discrimination or retaliation in violation of Title VII.  For the foregoing reasons, the Court will grant the motion for summary judgment of Quest Management Group, LLC (ECF 23).  A separate Order follows.

Date: August 23, 2012                       _____/s/_____
                                            Ellen Lipton Hollander
                                            United States District Judge